UNITED STATES of America, Plaintiff,

v.

Karl LINNAS, Defendant.

No. 79 C 2966.

United States District Court,
E. D. New York.

July 30, 1981.

---

Edward R. Korman, U.S. Atty., Eastern District of New York, Brooklyn, N.Y., Rodney G. Smith, Martha Talley, Trial Attys., Office of Special Investigations, Criminal Division, Dept. of Justice, Washington, D.C., for plaintiff; Leonard A. Sclafani, Asst. U.S. Atty., Brooklyn, N.Y., of counsel.

Ivars Berzins, Babylon, N.Y., for defendant.

*Memorandum of Decision and Order*
MISHLER, District Judge.

The United States of America commenced the instant action on November 21, 1979 pursuant to the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a), to revoke the Certificate of Naturalization (No. 7641679) of defendant, Karl Linnas, and to vacate the order of the New York Supreme Court (Suffolk County) admitting defendant to United States citizenship. The Government seeks to upset defendant's naturalization obtained in February of 1960 on the theories that his citizenship was (1) "illegally procured" and (2) "procured by concealment of a material fact or by willful misrepresentation." Either of these theories, if proven by "'clear, unequivocal, and convincing'" evidence which does not leave "'the issue in doubt,'" *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943) (quoting *Maxwell Land Grant Case*, 121 U.S. 325, 381, 7 S.Ct. 1015, 1028, 30 L.Ed. 949 (1887)),[1] would provide the court with no alternative but to enter a judgment of denaturalization against defendant. *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 752–53, 66 L.Ed.2d 686 (1981).

The Government's case turns on the legality of defendant's entry into this country in 1951 under the Displaced Persons Act of 1948, Pub.L.No. 80–774, ch. 647, 62 Stat. 1009, as amended (the "DPA"). The Government's five-count complaint alleges, *inter alia*, various heinous acts on the part of defendant during his residence in Tartu, Estonia between August 1941 and May 1943. In Count 1, the Government alleges that defendant was never lawfully admitted into the United States, a condition precedent for naturalization under Section 316(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1427, because (1) his activities during World War II precluded him from obtaining lawful entrance into the United States as an eligible person under the DPA, and (2) his willful misrepresentations made for "the purpose of gaining admission into the United States" under the DPA made him ineligible for admission under that Act. Counts II and III seek defendant's denaturalization based on the contention that his citizenship was procured by the concealment or misrepresentation of facts material to his eligibility for citizenship during the process leading to his naturalization in 1960. Contrary to defendant's sworn statements made for the purpose of acquiring citizenship, it is claimed that (1) he had committed crimes of moral turpitude, and (2) he was not a person of good moral character. Count IV alleges that defendant's citizenship was illegally procured

---

1. The Supreme Court has recently reaffirmed the applicability of the heavy burden of proof which is placed on the Government when it attempts to revoke an individual's citizenship. *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981).

since he in fact was not a person of good moral character. Finally, Count V states that, as a statutory matter, defendant was not a person of good moral character since he had given "false testimony for the purpose of obtaining . . . benefits" under the Immigration and Nationality Act. Section 101(f)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1101(f)(6).

## I. Pre-Trial Proceedings

■ On September 24, 1980, the court granted the Government's motion pursuant to Rule 37(a), Fed.R.Civ.P., to compel defendant to answer certain enumerated interrogatories. Defendant expressly defied the court's order by failing to fully answer the Government's interrogatories. The Government's subsequent motion for sanctions, wherein it requested that all relevant facts pertaining to the Government's unanswered interrogatories be deemed established, was granted. However, because of the peculiar nature of denaturalization proceedings, and in view of the "severe and unsettling consequences" which might ensue from the loss of citizenship, Fedorenko v. United States, 101 S.Ct. at 747, the court left defendant with the opportunity to rebut the facts which we would otherwise "deem[ ] established beyond a reasonable doubt. . . ." (Memorandum of Decision and Order dated October 14, 1980—findings of fact found at Appendix A). Following our imposition of sanctions pursuant to Rule 37(b)(2)(A) for the failure to answer interrogatories, defendant failed to answer certain questions at his deposition continuing his earlier claim rejected by the court of a Fifth Amendment privilege against self-incrimination. The court again ordered defendant to provide the Government with discovery, this time through his deposition testimony, and defendant once again refused. Consequently, the Government's proposed findings of fact sought to be proved through defendant's deposition testimony which he failed to provide was deemed to be established beyond a reasonable doubt, subject to rebuttal by defendant at trial. (See Memorandum of Decision and Order dated January 12, 1981—findings of fact found at Appendix B).

Though the Government had established the facts necessary to prove its prima facie case prior to trial, thereby relieving the Government of the need to offer evidence concerning many crucial facts pending the defense's offer of contradictory evidence at trial, the Government's pre-trial memorandum provided defendant with notice that it would present evidence on its direct case that would support its claims independent of the court's pre-trial fact findings made pursuant to Rule 37(b)(2)(A), Fed.R.Civ.P. (Government's Pre-Trial Memorandum mailed to defendant June 12, 1981).[2] Because the Government's offer of proof at trial overwhelmingly supported the allegations stated in its complaint, our decision today is based upon findings of fact established solely through the evidence adduced at trial.[3]

The case was tried before the court without a jury.

## II. The Trial

The defendant, Karl Linnas, was born on August 6, 1919 in Tartu, Estonia. He married his wife Linda on July 7, 1944 in Haap-

---

**2.** As we stated at the December 15, 1980 pretrial conference, a trial on the merits would ensue in spite of the findings of fact made pursuant to Rule 37, Fed.R.Civ.P. The only advantage to the Government arising from the sanctions imposed on defendant for his failure to comply with discovery was that the Government had sustained its prima facie case. (Transcript filed with the court on January 26, 1981 at 10.)

**3.** Defendant's counsel made numerous objections during the course of the trial that he was not given an adequate opportunity to prepare a defense. The objections were frivolous. The Government had expeditiously supplied the defense with extensive discovery. Moreover, on at least one occasion during the trial, the court offered the defense an opportunity to offer proof concerning an issue raised at trial at any time before the rendering of this decision. (Record 319–320). We note that the defense has failed to submit any further evidence since the completion of the in-court proceedings on June 19, 1981 which might suggest a different view of the facts than that which we have deduced from the evidence presented at the trial.

salu, Estonia and entered the United States on August 17, 1951 for the purpose of establishing permanent residence. (Government Exhibit 31, K. Linnas Petition for Naturalization).[4]

■ During the years 1940 through 1943, defendant resided in Tartu, Estonia. (GX–31, K. Linnas' Application for Immigration Visa and Alien Registration). In part, the trial focused on the activities of the German military forces, and the assistance provided them by an organization of Estonian nationals known as the "Home Guard" or "Self-Help" forces (referred to as the "Selbstschutz" by the Germans and as the "Omakaitse" by the Estonians) during the German occupation of Tartu which began in the summer of 1941. Specifically, the Government's case established clearly, unequivocally, and convincingly defendant's involvement as an active and voluntary member of the Selbstschutz starting in July of 1941. However, the information defendant had provided to immigration officials represented that he was a university student in Tartu during the period 1940–1943. Defendant failed to testify at trial on his own behalf,[5] and moreover, failed to appear at the trial.

### A. *Historical Background*

The Government called Dr. Raul Hilberg to comment on the German military movement into the Soviet Union following the German invasion on June 22, 1941 and to describe various German policies and the implementation of those policies during their initial assault.[6] Professor Hilberg testified that the German invasion into Estonia occurred in mid-July 1941. The invading German forces that swept through Tartu included the mobile killing units known as the "Einsatzkommandos." These units formed battalions, referred to as "Einsatzgruppen," which were charged with carrying out Nazi policy aimed at the annihilation of Jews and other groups found inimical to the Reich. (Record at 50–51, GX–2 through 10). Professor Hilberg described the operation of the Einsatzgruppen in one of his publications as follows:

"When the German Wehrmacht—the armed forces—attacked the USSR on June 22, 1941, the invading armies were accompanied by small mechanized killing units of the SS and Police which were tactically subordinated to the field commanders but otherwise free to go about their special business. The mobile killing units were operating in the front-line areas under a special arrangement and in a unique partnership with the German Army.

\* \* \* \* \* \*

The geographic distribution of Soviet Jewry determined to a large extent the basic strategy of the mobile killing units. To reach as many cities as fast as possible, the Einsatzgruppen moved closely

---

4. Hereinafter, Government exhibits admitted into evidence shall be designed by the letters "GX".

5. It is well within the discretion of a trial judge to draw an adverse inference against a defendant in a denaturalization proceeding because of his unexplained failure to testify on matters peculiarly within his knowledge. *Cabral-Avila v. Immigration and Naturalization Service*, 589 F.2d 957, 959 (9th Cir. 1968), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1245, 59 L.Ed.2d 472 (1978); *United States v. Costello*, 275 F.2d 355, 359 (2d Cir. 1960), *aff'd*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The Government, however, has sustained its burden without our drawing this permissible inference.

6. The court found Dr. Hilberg eminently qualified to testify on these matters. Dr. Hilberg has researched the holocaust since 1948 and has had the opportunity to examine numerous collections of captured German documents for the purpose of reconstructing the situation in Eastern Europe during World War II. (Record at 27–28). He testified that there was only one collection in the United States which he has not visited. (*id.* at 30). The witness has written extensively on the holocaust which he defined as the "physical destruction of European Jewry under the Nazi regime between 1933 and 1945." (*id.* at 23). His first publication, *The Destruction of the European Jews*, was published in 1961 and documented the Germans' diabolical destruction plans during the period 1933 to 1945. The work is some 800 pages in length and is substantially based on information contained in captured Nazi German documents. (*id.* at 36–41).

upon the heels of the advancing armies, trapping the large Jewish population centers before the victims had a chance to discover their fate.... In accordance with the agreement, units of Einsatzgruppe A entered the cities of Kaunas, Lepaya, Yelgava, Riga, Tartu, Tallin, and the larger suburbs of Leningrad with advance units of the army."

(GX–1 at pp. 177 and 191).

The Einsatzkommandos executed their duties in Tartu, Estonia, with the assistance of the Estonian "Home Guard," the Selbstschutz.[7] (Record at 52–57; GX–2 through 10). Dr. Hilberg's testimony was uncontroverted and is supported by captured German war records contained in the library of the United States National Archives. (GX–2 through 10).

Einsatzgruppe A, aided by the Selbstschutz, was successful in achieving one of its major objectives. By mid-January 1942, the Chief of the Security Police and the Security Service was able to report that Estonia was "judenfrei" (free of Jews) and that the execution of the Jews had been handled in such a manner so as to minimize public attention to the fact of the German extermination process. (Record at 58, GX–6). While Jews were shot solely based upon the determination of their religious ancestry, Communists were shot only if they were active in the party, with the balance either being set free or detained in concentration camps.[8] (Record at 56).

The Government offered the preceding historical evidence to establish, among other things, that if defendant was in fact a member of the Selbstschutz, then the Government's case would have shown that defendant assisted the enemy in persecuting civil populations. The evidence adduced at trial proved beyond a reasonable doubt that defendant was a ranking member of that organization; it also supported the conclusion that he committed deeds which, independent of his membership in the Selbstschutz, would require his denaturalization.[9]

### B. *Linnas' Involvement in the Selbstschutz*

#### 1. *Eyewitness Testimony*

The Government conducted video-taped oral depositions in the Soviet Union of four individuals. Three of the four deponents were shown an eight-picture photospread from which each positively identified defendant as an individual who held a position of responsibility in the detention of Jews and others being held either at the exhibition grounds located near Tartu or, after the concentration camp relocated, at the Kuperjanov Barracks on Kastani Street.

---

**7.** In his testimony, Dr. Hilberg stated that "[t]he German personnel in the Einsatzgruppen *did not* [personally] *engage in arrests or shoot-*ings to any great extent. They acted more as supervisors of indigenous personnel that were engaged in these activities." (Record at 55). The activities were carried out by the Germans' willing attendants—the Selbstschutz. (Record at 56).

**8.** As of September 19, 1941, the Chief of the Security Police and Security Service reported on the approximately 1200 arrests that had occurred in Tartu since the inception of German occupation earlier that summer:

"The greater part of them involve persons who were arrested for Communist activity. 504 persons were set at liberty after inquiries were completed and they were registered in lists. 150 persons were released since there were obviously no grounds for arrest. 291 prisoners were transferred to the detention camp established and supervised by the Tartu Military Administration Headquarters. A total of 405 persons were executed in Tartu, including 50 Jews. There are no longer any Jews in custody." (GX–3).

**9.** During some time in June 1940, the country of Estonia was annexed by the Soviet Union. Defendant's post-trial memorandum suggests that the forcible occupation and annexation of Estonia by the Soviet Union, given the atrocities which the Soviets committed during that conquest, provide ample justification for Estonians who chose to bear arms against the invaders of their homeland. We do not question justifiability of the Estonian desire to purge its land of the Soviet element. Nevertheless, defendant's motivations have no legal significance given the facts established by the Government at trial, e. g., defendant's supervision and participation in *atrocities* committed against human life. We also note that even if motivation could provide a basis for "legal justification," defendant offered no evidence on what *his* motivations were for joining the Selbstschutz and aiding the German cause.

The four individuals who testified by video-taped deposition were: Hans Laats, Olav Karikosk, Oskar Art, and Elmer Puusepp.

Hans Laats supervised the guards who guarded the prisoners at the Kuperjanov Barracks in Tartu. (GX–19–A at 17). He testified that Linnas served as a guard at the exhibition grounds and several months thereafter became the chief of the relocated concentration camp at the Kuperjanov Barracks. (id. at 22–23). Defendant, Laats, and the other guards at the camp were members of the Selbstschutz. (id. at 12, 15, 23).

Laats witnessed the execution of prisoners who had been held at the Kuperjanov Barracks. Those who were to be executed were kept in a special barracks at the camp on Kastani Street. (id. at 18). On a number of occasions he observed defendant supervising the prisoners who were being escorted out of the special barracks to an execution site. (id. at 23). Laats confessed to his own presence at one execution conducted at an anti-tank ditch (known as the "Jalaka Line") outside Tartu. This excavation had been converted by the Einsatzkommandos into a mass grave site for the victims of their extermination process. In recounting a portion of Jalaka Line execution, he stated that Linnas was the individual who had announced the death sentence and had commanded the guards to fire on the prisoners who were kneeling at the ditch's edge.[10] (id. at 24).

Laats identified Linnas both at his video-taped deposition and at an earlier meeting with a representative of the Department of Justice as chief of the concentration camp at the Kuperjanov Barracks. (id. at 33–36). We find that the eight-picture photospread from which Linnas was identified, considering the totality of the circumstances, indicates that the Laats identification of Linnas was reliable.[11] Cf. Neil v. Biggers, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972) (reliability of pre-trial identifications in the context of criminal prosecutions).

Olav Karikosk, a former concentration camp guard personally recruited by Linnas in October 1941, was ordered by Linnas to accompany him to an execution. (GX–20–A at 11–12, 24). The execution ritual was similar to the one described by Laats.[12] Karikosk positively identified Linnas at his video-taped deposition and on an earlier occasion as the chief of the concentration camp at the Kuperjanov Barracks.[13]

Oskar Art testified that he drove a bus which transported prisoners—on one occasion Jews, on two occasions non-Jews—to the Jalaka Line where they were shot. (GX–18–A at 18–24). Again, the execution ritual was similar to that described by Laats. Art stated that the prisoners were guarded by the Selbstschutz at all times. (id.). During one of the three executions in which he was involved, Linnas was present when the prisoners were herded onto the

10. Laats further testified that Linnas thereafter approached the ditch and, administering the coup de grâce fired into it. (GX–19–A at 24–25).

11. We also find that the pre-trial identifications made by Olav Karikosk and Oskar Art were reliable.
In making these determinations concerning reliability, we have been guided by the Court's recommendation in Neil v. Biggers:
"[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of

time between the crime and the confrontation." 409 U.S. at 199.

12. He testified that "Jewish women and children . . . were tied by their hands to . . . rope and boarded on [a] bus . . . [after] they had been undressed so that they were there in their underwear;" they were then taken outside the city to a so-called Jalaka Line some ten kilometers away from the city." (GX–20–A at 22–23). Upon arrival, the prisoners were commanded to kneel in front of the anti-tank ditch, their death sentences were given, and they were shot. (id. at 25–26).

13. Karikosk selected Linnas from an eight-picture photospread identical to the one presented to Laats except for the juxtaposition of the photographs.

bus destined for the execution site and when they were shot. (*id.* at 29). Art had known Linnas before the German occupation, (*id.* at 26–27). Art saw Linnas frequently after becoming a prisoner at the camp. (*id.* 30–31). Laats believed that Linnas was chief of the guards at the camp and the highest ranking Estonian there. (*id.* at 32–34). After viewing a photospread virtually identical to those used in the previously mentioned video-taped depositions, Art identified Linnas as chief of guards at the concentration camp at the Kuperjanov Barracks.[14] (*id.* at 37–40).

Elmer Puusepp was arrested by members of the Selbstschutz during the summer of 1941 because he had been a political officer under the Soviet Government. (GX–21–A at 7–8). Puusepp was eventually brought to the Kuperjanov Barracks with a group of approximately forty prisoners. (*id.* at 18–20). The group was divided in half. (*id.* at 20). The group to which he was not assigned was sent to the "death barracks," and Puusepp never saw anyone in that group again. (*id.* at 20, 25).

Puusepp testified that the man who he came to know as Linnas on one occasion had received prisoners at the Tartu concentration camp. (*id.* at 20–21). He recounted a second instance in which he had seen Linnas participate in the operations at the Kuperjanov Barracks. This incident occurred in the City of Tartu when Linnas helped direct Jews being ordered from a Jewish school onto a red bus which had been used on other occasions to remove prisoners from the death barracks at the concentration camp. (*id.* at 29). Linnas was seen helping a little girl "5 or 6 years old" with a doll as large as she was onto the bus. (*id.*). Puusepp noticed a guard carrying the little girl's doll to storage that very same evening together with clothing and other personal effects taken from those persons who had just been executed. (*id.* at 31).

His account of the general conditions at the camp was as follows: prisoners were fed soups made out of "[h]alf-rotten horse corpses or horse carcasses," (*id.* at 22); lice prevented the prisoners from sleeping, (*id.* at 38); and the barracks were so "tightly packed" that, at times, it was impossible to turn over. (*id.*).

Dr. Keiland, a citizen of Finland at the time of trial and a resident of Tartu during the subject period, testified at trial and stated that he witnessed the detention of Jews and non-Jews—men, women, and children—at the exhibition grounds ("Naituse Valjak") in Tartu during July 1941. (Record at 177–179). During his several visits to the exhibition grounds he viewed "Jews lying, sitting and sleeping in [cages of barbed wire.]" (*id.* at 178–181). Dr. Keiland did not see defendant at the camp on any of his trips. (*id.* at 183). However, he did identify those guarding the detainees as members of the Selbstschutz. (*id.* at 179–180).

Each of the video-taped depositions was admitted into evidence. The defense refused to attend the depositions held in the Soviet Union because it contended that any such proceeding conducted there would be a sham. Evidence offered at trial through defense witnesses attempted to show that the Soviets, on many occasions, have manipulated and, at times, have manufactured evidence to convict innocent Soviet citizens for the purpose of attaining political objectives of the Soviet Communist party. In essence, defendant contends that we must adopt a *per se* rule excluding all evidence deriving from Soviet sources. In rejecting this contention, we simply note one of the fatal flaws in defendant's broadbush attack on Soviet-source evidence. In the context of this case, the defense witnesses were unable to cite *any* instance in a western court in which falsified, forged, or otherwise fraudulent evidence had been supplied

---

**14.** The photograph of Linnas which appeared in each of the photospreads presented to the witnesses at each of the video-taped deposi-

tions conducted in the Soviet Union was the photograph of defendant submitted with his visa application in 1951.

by the Soviet Union to a court or other governmental authority. (Record at 470, 597–598, 646).[15]

■■■ The defense was unable to come forward with *any* proof that any of the Government's evidence offered at trial, either testimonial or documentary, was incredible or unauthentic in any respect. We find that defendant's defense by innuendo is without any merit. Having foresaken its right of cross-examination at the depositions taken in the Soviet Union, the defense cannot now claim foul play.[16] Moreover, various documents signed by Linnas (discussed hereunder) and the admission made by him to Richard Siebach (see note 17) corroborate the testimony of the Soviet witnesses as to Linnas' position and authority at the Tartu Concentration Camp.

### 2. Documents Signed by Linnas as Chief of the Concentration Camp

The Government offered copies of four documents bearing the signature "Karl Linnas" over the title "Chief of Concentration Camps" or "Chief of Tartu Concentration Camp." (GX–26, 27, 28, 30). These documents, dated November and December 1941, were certified by the Consular Division of the U.S.S.R. Embassy in accordance with Rules 902(3) and 902(4) of the Federal Rules of Evidence and Rule 44, Fed.R.Civ.P.

Each of the documents was admitted into evidence. The documents concerned the routine operation of the camp consisting of orders and correspondence pertaining to prisoners (GX–27, 28, 30) and a pass authorizing a guard to bear arms and travel at night (GX–26). These documents, if in fact signed by defendant, would establish Linnas' supervisory role at the Tartu Concentration Camp in the fall of 1941. We would further conclude that, as an Estonian, he was a member of the Selbstschutz aiding the Germans in the administration of their master plan.

Special Agent Michael Noblett of the Federal Bureau of Investigation, an expert document examiner, examined the four concentration camp documents and determined that (1) there were "strong indications" that the signatures were authored by defendant, (Record at 274), and (2) the physical condition and composition of the documents supported the conclusion that they are authentic, original and unaltered documents. (*id.* at 661–663). The defense failed to produce a document expert to challenge either their authenticity or the conclusion that defendant was the signatory. We find that the documents were signed by Linnas and are authentic and unaltered. The testimony of Laats, Karikosk, Art and Puusepp corroborates the finding that Linnas was a member of the Selbstschutz and served in a supervisory role in the management of the Tartu Concentration Camp.[17] We find that the Government has met its burden in establishing these facts.

**15.** After reading the deposition transcripts and viewing portions of each of the video-tapes taken in the Soviet Union, we find that the Government witnesses were credible.

**16.** The court however is disturbed by language used by the Soviet prosecutor when introducing members of the Department of Justice to deponents Oskar Art, Olav Karikosk, and Hans Laats. In each instance the Soviet official referred to the instant matter as an action by the United States against the former war criminal, Karl Linnas. The case was variously described as concerning: the "Fascist prisoner murder[er], Karl Linnas," (GX–18–A at 3) and "Karl Linnas, a former war criminal," (GX–19–A at 3, GX–20–A at 3). In evaluating the weight of the testimony given by these deponents, we have been mindful of the prejudicial language employed by the Soviet prosecutor. Accordingly, we have considered this evidence only as supportive and corroborative of the Government's primary evidence of Linnas' involvement at the Tartu Concentration Camp, the documents signed by defendant as chief of the concentration camp.

**17.** The Government presented further corroborative evidence of defendant's involvement at the concentration camp in Tartu, Estonia. Richard Siebach testified that defendant denied he had headed the Tartu camp in response to a question by Siebach about a newspaper article on that subject. Rather, defendant claimed only to have been a guard at the Tartu camp. (Record at 306–307).

C. *Linnas' Service in the German Army Following his Departure from the Tartu Camps*

The Government sought to establish that defendant voluntarily entered and served in the Estonian Schutzmannschaft as a junior lieutenant in May 1942, served in its successor organization, and then served in an Estonian Police Battalion between 1942 and 1944. Each of these military forces was an integral part of the German Army in World War II. (Record at 98–102; GX–13 and 14).

We find that defendant voluntarily joined one of the component units of "Security Cadre 41–E" in Tartu, Estonia.[18] (Record at 98; GX–11). This unit, composed largely of members who had served in the Selbstschutz, (Record at 90), was redesignated Schutzmannschaft Battalion 41–E within two months after defendant joined it. (Record at 97; GX–12).

Evidence presented by the Government *compels* the conclusion that some time prior to July 1944 defendant was transferred to the 38th Police Battalion. (Record at 103; GX–15, 16, 17). In July 1944 the 38th Estonian Police Battalion served under the command of an "SS Oberfuhrer" (Senior Colonel) and went into battle in an effort to halt the massive Soviet counter-offensive which was then underway. (Record at 105–106). The documents presented by the Government show beyond any reasonable doubt that Linnas was a volunteer in the 38th Police Battalion. (see Appendix C). The captured German documents, GX–15, 16, 17, contain a great deal of personal information concerning a wounded lieutenant SS volunteer named Karl Linnas. The information contained therein coincides with the information found in defendant's immigration records:

| | Information From Captured German Documents | Information From Defendant's Immigration Record |
|---|---|---|
| Name: | 1. Karl Linnas (GX–15, 16, 17) | 1. Karl Linnas (GX–31, 39) |
| Birth Date: | 2. August 6, 1919 (GX–16, 17) | 2. August 6, 1919 (GX–31, 39) |
| Place of Birth: | 3. Tartu, Estonia (GX–17) | 3. Tartu, Estonia (GX–31, 39) |
| Wounded in Battle: | 4. August 30, 1944 (GX–15) | 4. August, 1944 (GX–39) |
| Date of Marriage: | 5. July 7, 1944 (GX–15) | 5. July 7, 1944 (GX–31) |
| Wound or Marks of Identification: | 6. Large schrapnel penetration to right shoulder joint and upper right arm. (GX–17) | 6. Scar on right shoulder and back of neck. (GX–31) |

The Government's evidence is uncontroverted and overwhelmingly establishes defendant's service in the 38th Police Battalion, an arm of the German Wehrmacht. Accordingly, we find that defendant served in the German armed forces during World War II.

### III. Discussion

#### A. Postwar Immigration Procedures

In order to understand how defendant failed to comply with the conditions for naturalization, it is necessary to describe briefly the route which an alien was required to travel.[19] The Government witnesses who offered testimony concerning the standard operating procedures of officers and employees of the International

---

**18.** Dr. Hilberg testified that individuals taken *into* such units in May of 1942 would have been volunteers. (Record at 94). He had no knowledge of conscription into those units at that time. (*id.*).

**19.** In reviewing the immigration process, we must of course bear in mind that strict compliance with *all* conditions for naturalization is required:

"This judicial insistence on strict compliance with the statutory conditions precedent to naturalization is simply an acknowledgement

of the fact that Congress alone has the constitutional authority to prescribe rules for naturalization, and the courts' task is to assure compliance with the particular prerequisites to the acquisition of United States citizenship by naturalization legislated to safeguard the integrity of this "priceless treasure." *Johnson v. Eisentrager*, 339 U.S. 763, 791, 70 S.Ct. 936, 950, 94 L.Ed. 1255 (1950) (Black, J., dissenting)."

*Fedorenko v. United States*, 101 S.Ct. at 747 (footnote omitted).

Refugee Organization (the "IRO"),[20] the Displaced Persons Commission, and the American Consulate described the process just as it was outlined by Chief Judge Battisti in *United States v. Demjanjuk*, 518 F.Supp. 1362, 1378–79 (N.D.Ohio 1981):

> "In 1948, Congress enacted the Displaced Persons Act (DPA) to enable European refugees driven from their homelands to emigrate to the United States.[21] Section 2(b) of the DPA, 62 Stat. 1009, defined a displaced person eligible for emigration by incorporating the definition of 'refugees or displaced persons' contained in Annex I to the IRO Constitution.... [22] A person seeking a visa to the United States under the DPA normally followed a tripartite procedure.
>
> First, a refugee filed an application for IRO assistance. The applicant was interviewed by an IRO eligibility officer who elicited information about the applicant's personal and family history, with especial emphasis on the war years, in order to determine whether the applicant was qualified under the IRO constitution .... The primary source of background information inevitably came from the applicant himself. If qualified, the refugee was granted IRO assistance.
>
> Next, the refugee sought to qualify as an eligible displaced person under the DPA.

The Displaced Persons Commission was the agency in charge of implementing the DPA. Under sections 2(b) and 10 of the DPA, 62 Stat. 1009, 1013, positive eligibility under the IRO was a preliminary requisite. The IRO file containing the history of the particular refugee and the certification of IRO status was forwarded to the Displaced Persons Commission. A case analyst then made certain security checks on the background of the applicant to determine eligibility under the DPA and issued a report certifying that the applicant was a person eligible for admission into the United States under the DPA....

Finally, the case analyst forwarded an applicant's file, containing both the preliminary IRO certification and the Displaced Persons Commission report to the appropriate American Consulate. The applicant appeared at the consular office and was matched with an interpreter-typist, who assisted the applicant in filling out the application for an immigration visa. A vice-consul at the American Consulate reviewed the visa application and other documents in the applicant's file. The vice-consul then interviewed the applicant and, at a minimum, reviewed with the applicant all the entries which appeared on the visa aplication [sic]. If the

---

**20.** The IRO was an organization sponsored by the United Nations. Its Constitution was signed by the United States on December 16, 1946 (T.I.A.S. No. 1846) and became effective on August 20, 1948. See 62 Stat. 3037. Part two of Annex I of the IRO Constitution, 62 Stat. 3037, 3051 (1946), provided that certain persons would *not* be considered the "concern" of the IRO:

> "1. War criminals, quislings and traitors.
> 2. *Any other persons who can be shown*:
> (a) *to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or*
> (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations."
> .... (emphasis added)

**21.** The mass dislocation of persons caused by the devastation of World War II is well documented. The *Demjanjuk* court capsulized the magnitude of the problem as follows:

> "Following the conclusion of the war, the Allied armies became the guardians of about 8,000,000 persons including those liberated from extermination camps, former prisoners of war, and thousands of other persons dislocated by the hostilities. By 1948, 7,000,000 of these uprooted persons had been repatriated leaving approximately 1,000,000 persons in the United States, British, and French zones of Germany, Austria and Italy. S.Rep.No. 950, 80th Cong., 2d Sess., U.S. Code Cong. & Ad.News 2028, 2035 (1948). Many of these people lived in camps operated by the International Refugee Organization (IRO), an organization founded in 1946 to offer care and assistance to the dislocated masses and to provide for their eventual repatriation." At 1378.

**22.** Accordingly, the same persons who were not eligible for IRO assistance were also ineligible for lawful admission into the United States by virtue of Section 2(b) of the DPA. See note 20, *supra*.

vice-consul determined that the applicant met the criteria of the DPA and other immigration laws, he issued the applicant a visa." [23]

The immigration process leading to defendant's entry into the United States began in February 1948 when defendant's father, August Linnas, filed with the Preliminary Commission for the International Refugee Organization ("PCIRO") a signed and sworn application for assistance, on behalf of himself and his family, including defendant. (GX–38–B). The application stated that defendant was a student and technical artist in Tartu, Estonia from 1940 through 1943.

In mid-December 1949, defendant's wife, Linda Linnas, filed an IRO Resettlement Registration Form on behalf of herself, defendant and defendant's daughters. (GX–31). In reliance upon the information contained in the Application for Assistance to PCIRO and the Resettlement Registration Form, the IRO certified defendant as a displaced person and refugee, as defined in

Annex I of the IRO Constitution, on December 29, 1949. Karl Linnas in fact was not entitled to such certification.[24]

On April 27, 1951, James McDonald, a case analyst for the United States Displaced Persons Commission (the "Commission"), issued a report stating that Karl Linnas was eligible for consideration for admission into the United States.[25] However, defendant's certification as an eligible displaced person was made possible only as a result of the false statements he had made to members of the Counter Intelligence Corps of the United States Army (the "CIC") that, among other things, he had been a university student in Tartu, Estonia during the period 1940–1943,[26] he had never served in the German Army and he had not been a member of any political group or organization.[27]

On May 17, 1951, defendant filed a signed and sworn Application for Immigration Visa and Alien Registration with the United States Consulate at Munich, Germany, in which he claimed status as a displaced per-

**23.** "Section 10 of the DPA was amended by § 9 of the Act of 1950, 64 Stat. 219, 225–226 (1950) to clearly allow the vice-consul to make the final determination of eligibility of applicants, both under the DPA and under the general immigration laws. Conference Report, 81st Congress, 2d Sess., U.S.Code Cong. & Ad.News 2513–2523 (1950). Section 9 provided: 'no person shall be issued an immigration visa or be admitted into the United States under this Act if the consular officer or the immigrant inspector knows or has reason to believe that the alien is subject to exclusion from the United States under any provision of the immigration laws or (1) is not a displaced person and an eligible displaced person, or (2) is not eligible under the terms of this Act....'" *United States v. Demjanjuk*, At 1379 n. 35 (N.D.Ohio 1981).

**24.** The deposition testimony of Daniel Segat, an expert on the eligibility criteria for IRO assistance, was admitted into evidence. (GX–38). Mr. Segat, the Chief Eligibility Officer for the entire IRO operation between September 1950 and September 1951, (GX–38 at 8–9), testified that defendant would have been found ineligible for IRO assistance based on either his service as a concentration camp chief or guard in a German-occupied territory during World War II, (*id.* at 23–24), or based on his voluntary service in an Estonian Police Battalion or an

Estonian unit of the Schutzmannschaft, (*id.* at 24).

**25.** McDonald's responsibility as a case analyst was to determine an applicant's eligibility status under the DPA. (Record at 478). In making his evaluation, he relied on reports generated by the United States Army Counter Intelligence Corps (the "CIC"). (*id.* at 481). He testified that he would not have certified defendant as an eligible displaced person had he been aware of his service as a concentration camp guard. (*id.* at 483–484).

**26.** Dr. Keiland testified that the University at Tartu ("Tartu Ulikool") was closed during the summer and the autumn of 1941. (Record at 184). The consolidated report of German Major General Walther Stahlecker to the German Foreign Office concerning the activities of Einsatzgruppe A (June 23, 1941 through October 15, 1941) reported that educational activities had been halted at both the University of Tartu and the Technical Institute in Tallin. (GX–9–A at 95).

**27.** The Government established that defendant had made these false statements through the testimony of former CIC members Victor Johansen, (Record at 321, *et seq.*), Richard Priem, (*id.* at 374, *et seq.*) and Ray Whiteturky, (*id.* at 402, *et seq.*). See also (GX–39).

son. Defendant was issued an immigration visa on that same date. Ralph Fratzke, a former Vice Consul, United States of America, testified to the procedures by which visas were issued. He testified that a visa would not have been issued if the vice consul had known of defendant's wartime activities.[28] (Record at 507–508).

On May 21, 1951, defendant was examined by an officer of the Immigration and Naturalization Service (the "INS"), Walter Ziemak, for the purpose of determining whether Linnas was eligible to enter the United States. At that time, defendant signed two copies of INS Form I–144, one in Estonian and one in English. (GX–31). In accordance with the routine practice of the INS, Ziemak explained to defendant the contents of the form after defendant had read it, but before defendant affixed his signature to it. (Record at 525). By signing Form I–144 and then swearing to its contents upon entering the United States on August 17, 1951, defendant twice falsely stated that he had "never advocated or assisted in the persecution of any person because of race, religion or national origin. . . ."

### B. Defendant's Naturalization

Defendant executed an application to file a petition for naturalization as an American citizen on July 4, 1959. (GX–31). The INS checked petitioner's application against his immigration and visa file to determine that defendant's entry into the United States had been lawful.[29] (Record at 541–542, 544). It was routine practice for INS naturalization examiners to orally question petitioners concerning each of the questions on the application for naturalization. (id. at 545). Each applicant's interview was conducted under oath. (id. at 543). On December 14, 1959, defendant was examined by the INS and falsely swore to the con-

tents of his petition. Specifically, in answer to question 23, defendant denied that he had ever "committed a crime involving moral turpitude" or that he had ever "given false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws."

On February 5, 1960, the Supreme Court of Suffolk County, New York, without knowledge of defendant's true activities and whereabouts during World War II, admitted defendant to United States citizenship.

### C. Conclusion of Law

■ The United States Constitution vested Congress with plenary power in establishing rules for naturalization.[30] Pursuant to that power, Congress enacted Sections 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a), which provides that a naturalized citizen shall suffer the loss of his citizenship if the privileged status was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." We find that defendant's denaturalization is required under either standard.

### 1. Citizenship Illegally Procured

■ Citizenship is illegally procured if "some statutory requirement which is a condition precedent to naturalization is absent at the time the petition [for naturalization] was granted." H.R.Rep.No. 1086, 87th Cong., 1st Sess. 39, reprinted in, U.S.Code & Ad.News 2950, 2983 (1961). See Rogers v. Bellei, 401 U.S. 815, 830, 91 S.Ct. 1060, 1068, 28 L.Ed.2d 499 (1971); United States v. Ginsberg, 243 U.S. 472, 475, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917). Here, defendant lacked two statutory prerequisites for citizenship.

---

**28.** Mr. Fratzke testified because the individual responsible for issuing Karl Linnas' visa had died. (GX–41; Record at 501–502).

**29.** David Ilschert, a former naturalization examiner in the New York office during the period in which defendant was naturalized, testi-

fied concerning the naturalization process. (Record at 537, et seq.).

**30.** Congress is empowered to "establish a uniform Rule of Naturalization" under Article I, Section 8, Clause 4.

### a. Defendant Was Never Lawfully Admitted to the United States [31]

Since defendant entered the country under the Displaced Persons Act, the legality of his entry depends upon his eligibility under that Act. Section 13 of the DPA makes ineligible those persons who "*have assisted the enemy in persecuting civil populations of countries, Members of the United Nations ....*" [32] (emphasis added).

The facts speak for themselves. It is beyond dispute that defendant, Karl Linnas, "assisted the enemy in persecuting civil populations of countries, Members of the United Nations." *See Fedorenko v. United States*, 101 S.Ct. at 750 ("an individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa"). The inescapable conclusion is that defendant unlawfully entered the country because of the willful misrepresentations he made to the CIC and the INS for the purpose of gaining entrance into the United States:

"... Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall there-

after not be admissible into the United States." Section 10 of the DPA, 62 Stat. 1013.

Under the explicit terms of the law governing defendant's entry, his willful,[33] material [34] misrepresentations made him ineligible for a visa.

### b. Defendant Lacked the Requisite Moral Character

■ The second unsatisfied statutory condition precedent which made defendant's entry into this country unlawful derived from his lack of good moral character at the time he entered the United States. We find that defendant did not possess the required good moral character because of his voluntary involvement in the unjustifiable atrocities committed against men, women and children a relatively short period of time prior to his entry into this country. *See Tieri v. INS*, 457 F.2d 391 (2d Cir. 1972).

Section 316(a)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1427(a)(3), provides in pertinent part that:

"(a) No person, except as otherwise provided in this subchapter, shall be naturalized unless such petitioner, * * * (3) dur-

---

**31.** The requirements for legally procuring naturalized citizenship are set out in Section 316 of the Immigration and Nationality Act, 8 U.S.C. § 1427. Section 316(a)(1) provides, *inter alia*, that:

> *Residence*
> (a) No person, except as otherwise provided in this title, shall be naturalized unless such petitioner (1) immediately preceding the date of filing his petition for naturalization has resided continuously, after being *lawfully* admitted for permanent residence, within the United States for at least five years * * *. (*Emphasis added*).

**32.** See note 22, *supra*. Further, Section 13 of the DPA, as amended in 1950, 64 Stat. 227, provided that no visa would be issued under the Act to "any person who advocated or assisted in the persecution of any person because of race, religion, or national origin...." Accordingly, we also find that defendant failed to satisfy Section 13 of the DPA.

**33.** The evidence which we have discussed compels the conclusion that defendant's misrepresentations concerning his wartime activities, specifically, his participation in Nazi atrocities, were not inadvertent. Rather, his misrepresentations were knowing and willful. This conclu-

sion is further supported by defendant's perjury in 1946 during which time he filed a signed and sworn questionnaire for displaced persons. (GX–32). In it he stated that, during the years 1941 and 1942, he was employed as a temporary draftsman and student. In response to a question requiring disclosure of all military and political activity from 1936 to 1946, he failed to disclose any military service during 1941 and 1942.

**34.** Defendant's misrepresentations concerning his service of the German Reich were material. Each of the Government witnesses questioned concerning the consequences of having served as a guard in a concentration camp indicated that such an individual would be ineligible for either IRO assistance or for immigration under the DPA. (GX–38 at 24; Record at 342, 389, 484, 508–509, 528–529). "At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Fedorenko v. United States*, 101 S.Ct. at 749. The misrepresentation was equally material for purposes of defendant's naturalization. (Record at 557–558, 562).

ing all the period referred to in this subsection has been and still is a person of good moral character...."

Because we find that defendant failed to satisfy this condition for naturalization his award of citizenship was unlawful and must be revoked pursuant to Section 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a).[35]

Based on the foregoing, it is patently clear that defendant's citizenship was illegally procured and must be revoked.

### 2. Citizenship Procured by Concealment of a Material Fact or By Willful Misrepresentation

An alternative ground requiring the cancellation of defendant's certificate of naturalization ensues from the willful, material misrepresentations he made to the Government during the procedures leading to his naturalization in 1960. Section 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a). In stating (1) that he had never "committed a crime involving moral turpitude," (GX–31, Form N–400, question 23) and (2) that he was and had been "during all periods required by law, a person of good moral character," (GX–31, Form N–405, statement 15), defendant knowingly concealed, among other things, the facts of his service at the concentration camp in Tartu, Estonia during World War II. These facts were material under any view of the test of materiality as announced in *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). *See Fedorenko v. United States, supra.* Consequently, defendant's naturalization must be re-voked because it was procured by a willful misrepresentation of material facts.

## IV. CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that the order of the Supreme Court of the State of New York, Suffolk County, dated February 5, 1960, admitting defendant, Karl Linnas, to United States citizenship be, and the same is, hereby revoked and vacated, and his Certificate of Naturalization, Number 7641679, is cancelled on the grounds that such order and Certificate were illegally procured and were procured by willful misrepresentation of material facts under Section 340(a) of the Immigration and Nationality Act, 3 U.S.C. § 1451(a); and it is further

ORDERED that Linnas' Certificate of Naturalization, Number 7641679, shall be surrendered and delivered by Linnas to the Attorney General of the United States or his representative, the United States Attorney for the Eastern District of New York, on or before August 15, 1981;[36] and it is further

ORDERED that Karl Linnas is forever restrained and enjoined from claiming any rights, privileges or advantages of United States citizenship, including under or through any document evidencing United States citizenship; and it is further

ORDERED that the Clerk of the Court is directed: (1) to send forthwith a certified copy of this memorandum of decision and order to the Attorney General of the United

---

**35.** Defendant's lack of good moral character is also established by virtue of the false statements made on his petition for naturalization. Section 101(f)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1101(f)(6), provides in pertinent part:

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was

. . .

\* \* \* \* \* \*

(6) one who has given false testimony for the purpose of obtaining any benefits under this Act."

The misrepresentations made to the Displaced Persons Commission and Vice-Consul were false statements within the meaning of Section 101(f)(6) of the Immigration and Nationality Act.

**36.** *See* 8 U.S.C. § 1451(h). Surrender of defendant's Certificate of Naturalization is stayed pending appeal upon the condition that defendant file a notice of appeal within ten (10) days from the date of entry of judgment and diligently prosecute said appeal.

States; [37] (2) to send a certified copy of this memorandum of decision and order, and a certified copy of the judgment to be entered forthwith, to the Supreme Court of the State of New York, County of Suffolk,[38] and (3) to expeditiously enter judgment in favor of plaintiff United States of America and against Karl Linnas granting the relief requested in the complaint.

## APPENDIX A

The facts found in our October 24, 1980 decision were as follows:

1. Defendant resided in the City of Tartu, Estonia, during all or part of the period July 1, 1941 to May 31, 1943, at or near a site known as "the Kuperjanov Barracks."

2. In 1949, defendant resided in or near Neuberg, Germany where, during 1949, he initiated or caused to be initiated application procedures for a United States Immigration Visa as a displaced person, pursuant to the Immigration and Nationality Act of 1924, as amended, and the Displaced Persons Act of 1948, Pub.L.No. 774 (62 Stat. 1009).

3. Defendant did not attend the University of Tartu at any time after July 1, 1941. He did attend and graduate from an Estonian Army Officers Training Academy prior to that date, and on that date held the rank of Second Lieutenant or its equivalent in the Estonian Army Reserve.

4. On or before July 1, 1941, defendant was a member of the paramilitary organization known as the "Omakaitse." Defendant held the rank of Second Lieutenant in this organization, which assisted the military forces of Nazi Germany in conducting arrests, imprisonments, physical abuse, and execution of unarmed civilians in German-occupied Estonia during all or part of the period July 1, 1941 to May 31, 1943.

5. During the period August, 1941 to May, 1943, military and paramilitary forces of Estonia and Nazi Germany established and administered, under the supervision of the occupying military and police forces of Nazi Germany, concentration camps at various sites in Tartu, Estonia, including, but

not limited to, those sites known as "Naituse Valjak" and the "Kuperjanov Barracks," in which unarmed Estonia civilians, including men, women and children were imprisoned on the basis of race, religion or political opinion.

6. Defendant commanded the Tartu concentration camps at Tartu, Estonia, or was a member of the security forces of said concentration camps, during all or part of the period August, 1941 to May, 1942, inclusive.

7. During the period August, 1941 to May, 1942, the security forces at the Tartu concentration camps included what was known as the "special section," which selected prisoners, including unarmed civilian men, women and children to be put to death.

8. On one or more occasions between August, 1941 and May, 1942, defendant, on the basis of a list prepared and supplied to him by the aforesaid "special section" supervised the removal of prisoners from barracks at the Tartu concentration camp and their transfer to a site known as the "Jalaka Line" located near Tartu, and there supervised their execution.

9. In his capacity as an officer at the Tartu concentration camps, defendant wore the uniform of a Second Lieutenant or equivalent rank of the pre-1940 Estonian Army. He was armed with a pistol, which he carried to the aforesaid execution site, and from time to time fired that pistol at unarmed civilians in the course of their execution.

10. On or about May 26, 1942, defendant became a member of a military unit known as the Security Cadre Unit 41"E", as acting platoon leader of the heavy machine gun company. This unit assisted the military and police forces of Nazi Germany in Operations in German-occupied Estonia.

11. On August 30, 1944, defendant was a member of a military organization known as the 38th Estonian Police Battalion, in which he served as a Second Lieutenant or equivalent rank. This unit assisted the mil-

---

**37.** *See* 8 U.S.C. § 1451(h).

**38.** *See* 8 U.S.C. § 1451(h).

itary and police forces of Nazi Germany in operations in German-occupied Estonia.

12. For some or all of his services at the Tartu concentration camps, in the heavy machine gun company of Security Cadre Unit 41"E", and in the 38th Estonian Police Battalion, defendant was paid by the government of Nazi Germany.

13. On August 30, 1944, while a Second Lieutenant or its equivalent rank in the 38th Estonian Police Battalion, defendant was wounded and evacuated to Nazi Germany, at which time defendant continued to be supported by the government of Nazi Germany.

APPENDIX B

The findings of fact were as follows:

FACT: On August 22, 1945, United States military authorities issued to defendant an "A.E.F. Registration Record," also known as a "DP–2 card" . . . .

FACT: On or about August 27, 1946, defendant filed with the Third United States Army at Geretsried Displaced Persons Camp in Germany, a questionnaire for displaced persons, in the Estonian language, signed and sworn by defendant. [GX–32 admitted into evidence].

In response to this questionnaire, defendant stated, in item 6(b), that during the years 1941 and 1942, his occupation was as temporary draftsman and student. He further stated, in response to a question requiring disclosure of all military and political activity 1936–1946 (item 7), that his only service was in the Army of the Democratic Estonian Republic, 1938 to 1940, as a sergeant, and in an Estonian security battalion in Tartu, Estonia, 1943 to 1944, as a sergeant. In fact, during all or part of the period August 1941 to May 1942, inclusive, defendant was a member of the Omakaitse (Estonian Self-Defense) with the rank of second lieutenant, and commanded or was a member of the security forces of the Tartu concentration camps at Tartu, Estonia, and at no time during the period August 1941 to May 1942 was he a student.

Following defendant's misrepresentation, the Third United States Army established defendant's status as a displaced person.

FACT: On July 5, 1947, United States military authorities issued to defendant an "A.E.F. Registration Record," also known as a "DP–3 card" . . . .

FACT: On or about February 6, 1948, defendant's father, August Linnas, with defendant's knowledge and approval, filed with the Preliminary Commission for the International Refugee Organization a signed and sworn Application for Assistance (CM/1 form), in the German language, numbered 845742, on behalf of August Linnas, Ida Linnas (defendant's mother), Karl Linnas (defendant), Linda Linnas (defendant's wife), and Anu and Tiina Linnas (defendant's daughters) [GX–38–B admitted into evidence]. This application stated that from 1940 to 1943 Karl Linnas was a student and technical artist in Tartu, Estonia, and further that he was a university student from 1938 to 1943, when in fact, during all or part of the period August 1941 to May 1942 inclusive, defendant commanded or was a member of the security forces of the Tartu concentration camps at Tartu, Estonia, and at no time during the period August 1941 to May 1942 was he a student.

FACT: On or about December 16, 1949, defendant's wife, Linda Linnas, with defendant's knowledge and approval, filed an International Refugee Organization Resettlement Registration Form, bearing CM–1 number 845742, signed and sworn by Linda Linnas, on behalf of Linda Linnas, Karl Linnas (defendant) and Anu and Tiina Linnas (defendant's daughters) [GX–38–C admitted into evidence].

In reliance upon information provided in this form and in other documents referenced in this form, on December 29, 1949 the International Refugee Organization certified defendant as a displaced person and refugee, as defined in Annex I of the IRO Constitution, and as of concern to the IRO, when in fact, by virtue of his activities at the Tartu concentration camps, he was not entitled to such certification.

FACT: On one or more occasions prior to April 27, 1951, defendant was interviewed by representatives of the Counter Intelli-

 gence Corps, United States Army (hereinafter CIC) on behalf of the United States Displaced Persons Commission, for the purpose of establishing eligibility as a displaced person under the Displaced Persons Act of 1948, as amended. Defendant stated to the CIC that he was drafted into the Estonian Army on July 1, 1938 and served until June 1940, that he was again drafted into the Estonian Army on May 22, 1943 and served with the "Estonian Home Guard, Kreis Tartu" in the vicinity of Tartu, Estonia until he was wounded in August 1944, that he never served in the German Army or wore a German Army uniform, and that he had not been a member of any political group or organization, when in truth and in fact, as the defendant well knew, he had been a second lieutenant in the Omakaitse (Estonian Self-Defense) and in that capacity had been a commander or member of the security forces of the Tartu concentration camps during all or part of the period August 1941 to May 1942.

FACT: On or about April 27, 1951, James P. McDonald, a case analyst for the United States Displaced Persons Commission (hereinafter the Commission), based on the Commission's investigation and on statements, certifications and other documents contained in the Commission's files, issued on behalf of the Commission a report stating that the Commission had established that defendant had not advocated or assisted in the persecution of any person because of race, religion or national origin, and certified him as eligible for consideration for admission to the United States as a displaced person under Section 2(c) of the Displaced Persons Act of 1948, as amended.

FACT: On or about May 17, 1951, defendant filed an Application for Immigrant Visa and Alien Registration (Form 256a), signed and sworn by defendant, with the United States Consulate at Munich, Germany in which he claimed status as a displaced person [GX–31 admitted into evidence]. Attached as part of this application was the photograph of defendant, signed on the front and back by him. Also filed as part of this application and submitted herewith as part of [GX–31] was identity card number 004235 for Karl Linnas, dated August 22, 1941, a marriage certificate for Karl Linnas and Linda Saks, dated July 7, 1944, and four good conduct certificates pertaining to defendant's conduct in post-war Germany.

FACT: On August 17, 1951, defendant entered the United States for the purpose of immigration at New York, New York. Upon entry into the United States, he signed and swore to two copies of an "Affidavit as to Subversive Organizations or Movements" (INS Form I–144) [GX–31 admitted into evidence], one in the Estonian language and one in the English language, stating that he had never advocated or assisted in the persecution of any person because of race, religion or national origin. This affidavit had been read by and explained to defendant by an American official at Augsburg, Germany on or about May 21, 1951.

## APPENDIX C

One of the documents establishing defendant's service in the 38th Estonian Police Battalion is Government Exhibit 15–A, a German Nazi document captured by the allies, which reads as follows:

| | |
|---|---|
| (stamp) | (120) |
| Higher SS and Police Commander (HSSPf), Baltic Sea | (stamp: Feb. 13, 1945) |
| Welfare Headquarters—Subsidiary Office I | |
| File symb.: F.U.Ausland Ja/HO | Schwerin, Feb. 2, Arsenal 1945 |
| Subj.: Volunteer pay | |
| To: | (stamp: Office for Member Support Abroad |
| SS Race & Colonization Main Office | rec.: Feb. 10, 1945) |
| —Office for Member Support Abroad— | |

*Prague II*

Karl Laznowsky Quay 60

The Estonian volunteer, Lieutenant of Protective Police *Karl Linnas*, born on Aug. 6, 1919, belongs to Police Front Battalion 38, APO no. 46,903, he was wounded on Aug. 30, 1944. He is now under outpatient treatment here in Schwerin and is residing with his wife at Severinstr. 34. He has been married since July 7, 1944.

About mid-December 1944 he applied to you through his hospital for continued disbursement of combat pay, which he has not received since July 1, 1944.

444

I request to be informed immediately as to what became of his application, since the combat pay is urgently required for his living expenses. Remittance can be made to account no. 6082 of the Sparkasse (Savings Bank) in Schwerin/Mecklenburg.

(stamp: NOT IN FILE) (signature)

SS 1st Lieut. (Reserve)